IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KENNETH L. FERGUSON, et al : | CIVIL ACTION |
| v. : | |
| VALERO ENERGY CORP., d/b/a : | |
| DELAWARE CITY REFINERY, et al. : | NO. 06-540 |

## MEMORANDUM OF LAW OUTLINING EVIDENCE IN SUPPORT OF CLAIM THAT THE DELAY IN THE TURNAROUND FROM SEPTEMBER TO NOVEMBER CAUSED SAFETY PROBLEMS THAT IN SOME WAY CONTRIBUTED TO MR. FERGUSON'S DEATH.

Pursuant to the Court's direction, below is the evidence in chronological order that the delay in the turnaround from September to November caused safety problems and contributed to Mr. Ferguson's death:

1. On September 1, 2005, Premcor provided Valero with an evaluation the impact of a delay in the Turnaround focused solely upon cost versus increased price of gas due to the supply shortage caused by Katrina. (See Exhibit "A"). An October 2, 2005, e-mail confirms the sole reason for the delay: "As a result of Hurricane Katrina, the Coker and Hydrocracker Turnaround was delayed 3 weeks to capture increased margins...." (See Exhibit "B").

2. There is no evidence of any analysis of the impact of a Turnaround delay upon safety issues.

3. During the delay of almost one month before the Hydrocracker Turnaround started, the Hydrocracker Unit ran at or above peak capacity to produce gasoline while high demand created soaring prices. During this period when opportunity and time existed to do so, there was no effort made to:

    a. Further train/evaluate operators on the new permit writing process which was just put into place within the past 60 days.

    b. Require mandatory training for the several hundred new contractor workers being brought in specifically for the Turnaround to address the new permit writing process, how Mutual Understanding would be achieved or, more importantly, further address and explain the hazards they would be presented with during the Turnaround, including the nitrogen hazards.

4. After the delayed start to the Turnaround on October 6, it quickly fell behind schedule and the following events occurred:

  a. On October 14, 2005, at a Leadership Roundtable meeting where Valero corporate and Premcor management was present, the need for "additional Turnaround support" including "safety supervisors" was recognized. (See Exhibit "C")

  b. On October 16, an agreement was executed to change the permit writing process to allow the delegation of Mutual Understanding and job site inspection because there were insufficient operators to write all permits and the requirement of Standing Instruction 2.5.1 were considered too "time consuming". (See Exhibit "D"). No effort was made before or after the October 16 Agreement for refresher/additional training to operators or contract workers about the procedure which directly violated Standing Instruction, 2.5.1.

  c. Testimony of both operators and contract workers will show confusion on how Mutual Understanding was to be accomplished during the Turnaround, including confusion regarding how the "delegation process" would occur.

  d. On October 20, Bill Hughes, the Nighttime Southside Project Manager (where the Hydrocracker Unit was located) issued a memorandum identifying a "disturbing trend" in "managing safety performance" over the past 10 days. (i.e. since shortly after the Turnaround started). At deposition, he confirms that he complained about "practice not equaling procedure" regarding Mutual Understanding, which was not occurring in the field. (See Exhibit "E")

 5. On October 19, 2005, Valero Corporate approved Premcor's recommendation to accelerate the work schedule from 6 days/week, 10 hours/day to 7 days/week, 12hour/day since the Hydrocracker schedule had already fallen 4 days behind after it started on October 6th. Premcor was now reviewing its ability to "pull in" the Hydrocracker schedule. (which is the Reactor used to make gasoline). (See Exhibit "F").

 6. The evidence demonstrates the "push" to accelerate the Hydrocracker Turnaround and get "back on line" as quickly as possible since Valero/Premcor was projecting even greater benefits once the Turnaround was completed to produce gasoline at increased market prices. (See Exhibit "A" on Page 2 analyzing pre and post Turnaround gross margin analyses).

 7. Between October 14 and November 5:

  a. No new safety supervisors are hired despite an identified need on October 14th. ;

  b. No additional training is mandated for operators or contract workers on permit writing changes or Mutual Understanding despite notice of failure to conform with safety practices.

  c. No effort is made to alert/warn workers of specific issues relating to the nitrogen hazard outside a vessel under purge.

2

8.     On November 5, Premcor management decides to change the job sequence from the original plan that was reviewed and approved by the Safety Department. The change in the job sequence was to catch up because work on Reactor 36 was several days behind schedule. Valero "saw an opportunity to advance the job and were going to take it" (See Hughes N.T. at page 87 at Exhibit "G").

9.     The change in job sequence accelerated placing the Reactor head ("Top Elbow") on Reactor 36-R1 all Unit 36 Reactors were prepared for installation of their reactor heads.

10.    During the Turnaround, vacations/absences are not allowed and employees scheduled such vacations/absences to occur after the turnaround was originally scheduled to end.

11.    Because of the delay, the Turnaround took place during previously scheduled vacations and absences on November 5 of the following:

    a.     Safety Department Personnel -

        i.     Joan Broda-Forbes, the daytime safety department representative for the Southside Turnaround, who would have been present during the daytime when the change in job sequence decision was made

        ii.    Michael McCloskey, the nighttime safety department representative for the Southside Turnaround, who would have been on duty when the accident occurred and available to review the site and make sure safety issues that may have been missed by operations or contract workers were addressed and resolved.

    b.     Operations –

        i.     Tom Fitzpatrick, the Night-time Shift Team Leader and Supervisor of Byron Johnson, who wrote the permit at issue.

12.    Melanne Caverly, the safety department head responsible for replacing safety personnel has testified that:

    a.     She did not do anything to find out if replacements were needed (Caverly N.T. 152:20 – 153:3);

    b.     She was never informed of the decision to change the job sequence that date to install the Reactor head ("Top Elbow") that evening (Id. at 153:5 – 154:5)

    c.     This information was necessary to decide if a safety supervisor should be replaced. (Id. at 153:19 – 154:20)

    d.     If she had known this information, at minimum, she would have made arrangements to have one of the other safety people on duty covering the work (Id. at 154:22 – 155:6).

13. This means that no safety department member assigned to the Southside Turnaround was on site at the time of this accident and for almost 24 hours preceding it despite:

    a. An identified need for additional, not less safety supervision as of October 14, 2005;

    b. Acknowledgement of a continuing problem with "managing safety performance" on October 20.

    c. Awareness that important safety steps, such as Mutual Understanding and joint jobsite inspection, were not occurring consistently.

    d. Acknowledgement by Melanne Caverly that she would have secured safety department coverage if she had known about a change in job sequence that not only involved a crane swinging equipment over the heads of people on one reactor, but also the need to open a vessel under nitrogen purge. (N.T. 153:19 – 154:5).

14. The fact that defendants intend to present testimony of Brian McCloskey regarding an earlier incident confirms the nexus. He testified that in late October, he walked to Unit 33 and observed workers on a deck within a properly marked off fresh air zone without a gas monitor in full view of two Valero operators. He addressed this issue to ensure it was safe to proceed.

15. After writing an error-filled permit, Byron Johnson handed the permit to John Lattanzi in violation of the procedure contemplated by the Safety department. No mutual understanding or jobsite inspections took place in a situation where a safety supervision vacuum was created by the absence of Tom Fitzpatrick without scheduling a replacement when the "assigned" permit writer was absent as well.

16. The reason for the change in job sequence was to push/catch up on the Hydrocracker Turnaround to get back on line as quickly as possible after the Turnaround was delayed 3 weeks to take advantage of continued "favorable margins" in the marketplace after it was delayed 3 weeks.

Dated: July 12, 2010

McCANN, SCHAIBLE & WALL, LLC

BY: _____
Brian A. Wall, Jr.
Counsel for Plaintiff

4